Peck, J.,
delivered the opinion of the court:
On the 15th day of January, 1863, Leonard B. Pratt, a citizen of Bucksport, in the county of Hancock, State of Maine, then being at Newbern, North Carolina, entered into an agreement or charter-party with Captain James C. Slaght, an assistant quartermaster of the United States, for and on behalf of the United States, whereby the United States were to take and freight a steamer or vessel called the Dirigo, of the burden of 181|-§ tons, or thereabouts, then lying and being in the port of Newbern, aforesaid, the vessel to be laden at Newbern, and proceed on her voyage as should be thereafter directed, upon the terms and conditions stipulated by the charter-party. The vessel immediately entered upon the service required, and remained in the employment of the United States until the 10th day of June, A. D. 1864. The compensation agreed to be paid for the use of the vessel was $200 per day; the owner of the vessel to keep her tight, stanch, strong, and well and sufficiently manned, victualled, tackled, apparelled, ballasted, and furnished in every respect fit for merchant service, at his cost; the contract to continue in force for the full term of one month from the above date, or as much longer as said vessel should be required by the United States War Department, which department assumed the war risk upon the vessel.
The steamer was valued by the contract at $25,000; but her ’ owner claims that her true value was $75,000. It is sought by this action to recover not only that part of the earnings of the boat which were withheld from the proprietor, viz : $100 per day for 357 days, but also the value of the vessel; which, he alleges, was lost to him by the fault of the United States. He claims in all $102,500. The charter-party is copied nearly verbatim, as follows :
“The charter-party of affreightment made and concluded on the 15th day of January, in the year of our Lord 1863, between Leonard B. Pratt, master of the steamer or vessel called the Dirigo, of the bur-then of 181|-§ tons, or thereabouts, at present lying in the port of Newbern, North Carolina, and commanded by Leonard B. Pratt, of the one part, and Captain James C. Slaght, assistant quartermaster, *107 of tbe other part, witnesseth: That the said Leonard B.-Pratt, agent, does and doth hereby grant and to freight let, and the said James C. Slaght, assistant quartermaster in the department of North Carolina, does and doth hereby grant and to freight take, the said steamer or vessel called the Dirigo, to load at Newbern, North Carolina, or elsewhere, and proceed on the voyage as hereinafter mentioned, always reserving sufficient room for the storage of the vessel’s cables and materials, and accommodations for the officers and crew. And thereupon Leonard B. Pratt and his heirs, executors,'administrators and assigns do hereby covenant and agree to and with the said Captain James C. Slaght, assistant-quartermaster, that the said steamer Dirigo now is, and shall he kept during the whole of the voyages mentioned in the contract, tight, stanch, strong, and well and sufficiently manned, victualled, tackled, ap>parelled, ballasted, and furnished in every respect fit for merchants’ service, at the cost and charges of her owners; and this day of the date hereof, be ready to receive on hoard, whenever there tendered alongside by the quartermaster of the United States army, their factors or assigns, such goods as they shall order and direct, and the said vessel can conveniently stow and carry, and when laden shall sail as ordered by the quartermaster of the United States army, and deliver cargo to the. quartermaster or duly authorized agent of the War Department. All port charges will be paid by the-War Department, all cargo to be received and delivered within reach of the said vessel’s tackles; and said vessel shall deliver her cargo in good order and condition, the dangers of the seas and navigation, and the restraints of princes and rulers, being always excepted. In consideration whereof, the said Captain James C. Slaght, assistant quartermaster of the United States army, hereby binds and obligates it and them to employ the said vessel on the voyage or voyages aforesaid, and that as freight or hire of the said vessel during the term of this contract they will pay or cause to he paid the full and just sum of $200 per day and coal, for each and every day that said steamer may he employed, until the said steamer is returned to the said Leonard B. Pratt, to Newbern or some other port north of Halteras inlet, to become due, owing, and payable to the order of Leonard B. Pratt at the Quartermaster General’s office of the War Department at Washington, upon presenting certificates of the duly authorized agent of the United States War Department that said vessel has safely delivered her cargo according to bill of lading, and faithfully performed her part of the contract. The contract to continue in force for the full term of one month from the above date, or as much longer as said vessel may *108 be required hy the United States War Department, said War Department taking the war risk upon the aforesaid vessel. Said steamer is valued at $25,000. To the faithful and true performance of all which several conditions, covenants, and agreements to be done, paid, and performed, the said parties bind and oblige themselves.”
General Foster, who was then stationed at Newbern, in command of the department of North Carolina, deposes “ that the steam derrick Dirigo was chartered at Newbern, North Carolina, in January, 1803, by Colonel Biggs, assistant quartermaster, United States army, by my orders.” The charter party was signed by Captain James C. Slaglit, assistant quartermaster.
It is shown that the Dirigo was peculiarly constructed. She had very light draught, with great floating power, and a powerful hoisting apparatus, which made her very desirable for the contemplated uses of the army. General Foster says she was peculiarly recommended to him “ for the purpose of landing from vessels heavy ordnance, and other heavy stores to be used in the contemplated siege of Charleston.” * * * “ Her light draught enabled her to run in close to shore at high tide and land heavy weights from her derrick upon the beach, even where there was no wharf. She had apparatus for wrecking and diving which might be of value, but the main object I had in chartering her I have described above. As far as I could judge, when I examined this steamer before chartering her, I found her apparatus, hull, and everything belonging to her in good order. There were no other vessels within my reach that could have performed the same service as the Dirigo.” Tliis testimony shows that the vessel was a necessity, and that the propriety of employing her was fully considered.
Soon after the Dirigo was chartered she was ordered to proceed to Beaufort, North Carolina, and did so. On reaching Beaufort her commander was sent to sea with sealed orders, not to be opened until after she had, proceeded some distance from that port. On opening the orders it was ascertained that the vessel was to proceed to Hilton Head. These directions were observed, and on her arrival at that place the captain reported to the quartermaster of General Foster’s fleet of transports. It is unnecessary to detail all the subsequent movements of the vessel, though it may be said that the officers of the department where she was employed concur in stating that the vessel was of great benefit to the army; and no complaint is made by any of them of any deficiencies in her equipment, movement, or power..
These facts established, and the obligation to pay a fixed considera *109 tion for the use of the vessel having been assumed by the United States, it might be supposed that there was hut little occasion for controversy. The obligations were mutual and well defined. They were fully performed by the claimant on his part, and he might well expect that the government would respect its correlative duty by adhering faithfully to its agreement.
The charter party appears to have received the approval of the Quartermaster General, as payments were made thereon according to its terms without objection, from its date (the 15th of January) until the 17th of June following. In July the notice inserted below was communicated to the claimant:
“Hilton Head, S. C., July 11, 1863.
“ Sm: By order of the Quartermaster General, I have the honor to hereby notify you that the steamer Dirigo’s rate of compensation has been reduced to $100 per day, to date from the 17th day of June, 1863.
“ I am, sir, very respectfully, your obedient servant,
“ J. J. Elwell,
“ Jieut. Gol. and Quartermaster, Dept, of the South.
“ Captain Peatt, Commanding, Steamer Dirigo.
“ True copy:
“ Geoege D. Wise,

“Col. and Quartermaster of Dept., Brev. Brig. Gen. Vols.”

If this was intended as information that the United States had-decided to terminate the contract for the use of the vessel, and that she was to be thereafter at the absolute disposal of her owner, it would have been to that extent unobjectionable; but if the notice was designed to reduce the compensation in defiance of the contract, and still retain the vessel in service, it was unavailing for that purpose. Still less could it have the effect to reduce the compensation previously earned.
A notice on the 11th of July that money fairly earned in the previous month of June would be withheld, when the obligation to pay it is “nominated in the bond,” excites our surprise. We cannot attribute such action to ignorance of law, for that is not probable; but must suppose that there exists in the minds of some of the superior officers of the departments some mystical but erroneous notion as to their power over executed contracts, which, whether exercised from good or bad motives, cannot be upheld.
*110 The law which binds a citizen to the performance of his covenants with the government will also protect him against all aggressions upon his rights under them. A contract between the United States and a citizen is equally obligatory upon both. The laws makes no distinctions as to parties, and when appealed to for redress is inexorable in its application.
The notice might have been effectual to terminate the contract, if it had been so expressed; and it may be regarded as a declaration by the United States, that if service should be rendered in the future by the claimant, then only so much compensation would be paid as was specified in the notice.
The claimant, acting upon this supposition, refused to continue his vessel in the service for the remuneration offered, and thereupon wished to withdraw her altogether, as appears by the following correspondence :
“Morris Island, S. 0., August 6,1863.
“Sir: On the 15th day of January, 1863,1 entered into a charter-party with Captain Slaght, quartermaster for the department of North Carolina, by order of Major General Foster, for the steamer Dirigo for thirty days, or as much longer as government saw fit to keep her, at $200 per day.
“ On January 17 I received orders to proceed to Beaufort, N. 0., and on January 30 I received sealed orders from Major General Foster to proceed to sea, said orders to be opened when fifty miles south of Beaufort, N. 0. "When, on opening said orders, I found I was ordered to Hilton Head, S. 0., where I duly arrived.
“That on the 16th of February I received notice from Colonel Elwell, saying that the transports of the 18th army corps must report to his'office, which was duly done, since which time the steamer Dirigo has been kept in the department of the South.
“ About ten days ago I received a notice from Colonel Elwell, dated July 11, saying that by order of the Quartermaster General he had been ordered to notify me that the compensation for the Dirigo had been reduced to $100 per day, to date from the 17th of June.
“At the time I received the notice from Colonel Elwell, the Dirigo was busily engaged in transporting heavy guns from Stone river to Morris island, and now, as the guns are upon the island, I claim and demand a discharge from government, according to said charter-party, as the $100 will not pay the loss of my steamer by the worms, which *111 are now fast destroying. her, and will entirely destroy her in a few months more.
“ Bespectfully yours,
“L. B. Pratt,

“Master and Owner of Steamer Dirigo.

“ Captain J. H. Moore,
“ Chief Quartermaster in the Field.”
“ Office Chief Quartermaster IN the Fieid,
“ Morris Island, S. G., August 6, 1863.
“ Bespectfully referred to Major E. W. Smith, A. A. C., for the consideration of the general commanding.
“ I would respectfully suggest that as the Dirigo is much needed at present she he kept in service here, and the justness of the owner’s claim can be considered hereafter by the Quartermaster General.
“ John H. Moore,
“ Captain and A. Q. M., Chief Quartermaster in the Field.
“ Please return this communication.
“ Dirigo to be kept here till further orders.
“.Q. A. Gillmore,

“Brigadier General-.

“ True copy.
' “ George D. Wise,

“Colonel, Quartermasters' Department, B’t Brig. Gen. Vols.”

“A short time previous to the foregoing correspondence the claimant applied to the quartermaster of the department for a certificate for service previously rendered, to enable him to demand and receive his compensation under his charter-party. Upon this request the following certificate was furnished :
“ Chief Quartermasters’ Office,
“Tenth Army Corps, Department of the South,
“Hilton Head, Port Royal, S. G, July 17, 1863.
“ I hereby certify that the steamer Dirigo has faithfully performed the requirements of her charter-party in the quartermasters’ department of the department of the South, from the 17th day of June, 12 m., 1863, to the 17th day of July, 12 m., 1863, and is entitled to compensation according to the terms of her charter for the above time. And I further certify that she is indebted to the United States government for no stores or supplies received here. Charter reduced by order of *112 the Quartermaster General to $100 per clay, to date from the 17th day of June, 1863.
“J. J. Elwell,

“Lieut. Col. and Q. M. Tenth Army Corps, Dep’t of the South.”

The testimony of the claimant in the case, which is in no respect impugned, shows that after receiving the notice of the 11th of July, and as soon as he had executed the orders about which he was then occupied, he notified the local quartermaster that inasmuch as the United States would no longer regard the charter-party as binding he demanded an immediate discharge of his steamer, which wasrefused.
Following up his complaints of the injustice sought to be done him, the claimant came to Washington with the certificate of service before quoted, and indorsed upon it previous to its presentation for payment the following protest:
“WASHINGTON, D. 0., September 15, 1863.
“ Sir : I protest against the making of any reduction in the rate of compensation for the use and services of the steamer Dirigo, and I claim and demand under the charter-party made with the United States government, and dated January 15,1863, the full compensation of $200 per day for each and .every day the said steamer Dirigo has been employed and remaining now unpaid under said charter-party.
“L, B. Pratt.
“ Brigadier General M. C. Meigs,

“Quartermaster General U. S. A., Washington, D. G.

“ Sworn and subscribed at Washington, D. C., this 15th September, 1863, before me.
[Stamp.] “Geo. C. Thomas, Notary Public.
“ True copy.
“George D. Wise,

“Colonel Quartermasters’ Dep’t, Brevet Brig. Gen. Vols.”

The protest was disregarded.
It is not necessary to recapitulate the numerous protestations and repeated efforts of the claimant to protect himself against injustice and oppression and to save his rights. His vessel, notwithstanding all his remonstrances, was retained in the service, the quartermaster continually persisting- in his refusal to pay more than $100 per diem for her services, until the 9th day of June, 1864, when she was examined by a board of officers, who reported that the hull of the steamer below the water-line was entirely destroyed by the worms, rendering her unsea- *113 worthy, &c. This result the claimant had all along represented was probable, and for which, among other reasons, he urged that his vessel should he released from service, insisting that her probable destruction was a sufficient reason, independent of the contract, against any reaction of his compensation. Immediately after the report of the board of examining officers, the boat was turned over to claimant, who took the machinery from the hull of the vessel and abandoned her.
There is another circumstance connected with this transaction which we comment upon with regret, but which the case forces upon our consideration. He exposes a kind of strategy which, if known to military law or usage, we may safely say is unknown to the civil or moral code. "We will let the claimant relate it for himself:
“ On the 26th or 27th of March, 1864, I was at Washington, and presented the case to Colonel K. E. Clary, the proper officer in the bureau of the Quartermaster General, with the certificates of service from August 17, 1S63, and again requested the discharge of said steamer, and again was refused. Payment at the rate of $100 per day was also refused unless I would *make a new charter-party, dating back to June 17, 1863. Not wishing to make a new charter-party, I withdrew my papers from the Quartermaster General’s office.
“ It was not until this time, March, 1864, that any officer or person, by notice, demand, or request, intimated to me that it was the desire of the government that a new charter-party should be executed, and then only verbally by Colonel Clary. More than nine months of service had been performed by said steamer after the order was given to reduce the rate of compensation before any demand or request was made for a new charter-party.”
For the honor of the government, or rather of its agents who had resort to this scheme, we should be pleased had their conduct been in any way explained or excused, but it is not. Here was an unwarrantable attempt, by withholding from the claimant the money which was acknowledged to be due him, to coerce him to execute a new contract, which, it was supposed, would abrogate the old, and so defeat a recovery upon it.
The foregoing statement may account, in some measure, for the action of the claimant in signing the receipt hereafter to be mentioned, which the Solicitor insists should defeat this claim. The claimant unsuccessfully continued his efforts to obtain his money until the 5th of May, 1865, when a partial payment was made. He says : “ I was at Washington from December, 1864, until May, 1865, and at the office of the Quartermaster General nearly every day during that time, *114 endeavoring to make a satisfactory settlement, but could not.” On or about the 3d day of May, he says he received for the services of his steamer payment at ,the rate of $100 per day for 298 days, for which he gave, under protest, a receipted bill, as follows :

I certify that the above account is correct and just; that the services were rendered as stated, and that they were necessary for the public service.
Received at Washington, D. C., the 5th day of May, 1865, of Captain R. Brinkerhoff, assistant quartermaster United States army, the sum of twenty-nine thousand and three hundred and twenty-two dollars and thirteen cents, in full of the above account.
L. B. Pratt.
H. D. Brookman.
John U. Brookman.
Tbe following protest was filed in tbe office of tbe Quartermaster General at or about tbe time of tbe signing of tbe receipt:

“To the Quartermaster General United States army, and to all to whom, it may concern:

“ Know ye that I, Leonard B. Pratt, of Bucksport, in tbe county of Hancock, and State of Maine, having a balance against the United States for services rendered by the steamer Dirigo, under charter in the United States quartermasters’ department, do hereby, in addition to my previous protests in connection with the aforesaid charter of the said steamer Dirigo, extend them, and hereby enter again my protest against any reduction being made in the rate of compensation under the aforesaid charter, dated the 15th day of January, 1863, and against receiving any amount of money less than the full amount called for and agreed upon and stipulated in tbe said charter as compensation *115 for services of said steamer Dirigo, and do hereby demand the fall payment of the amount due according to the agreement and terms stated in the aforesaid charter. And as I have been in the city of Washington,*D. C., now from the 1st day of January, 1865, trying to get a settlement with the quartermasters, I now take what moneys the quartermaster reports due me in part payment upon the charter of steamer Dirigo as due. And all bills I sign and give for moneys received or papers given I signed under these my protests.
“ In witness whereof I have hereunto signed my name this the 2d day of May, 1865.
“LeonaRD B. Pratt.
“ Sworn and subscribed to before me, at Washington, D. C., this 2d day of May, 1865.
[l. s.] “ M. H. N. Kendig,
[Stamp.]' “Notary Public.”
The Solicitor for the United States claims that the above receipt was a final adjustment of this whole matter. If the receipt had expressed that it was a payment in full for the whole number of days the vessel was employed, this assumption would have been more reasonable, but it does not. Even then, under the rulings of this court heretofore made in what are known as the Reeside case, the case of Ramsdell and Smith, and other cases, we must hold that the receipt here set up as a defence does not bar or estop this claimant from further recovery upon his contract.
The circumstances and conduct before navrated are so unusual and unjust, to use no harsher terms, as to convince us .that the claimant was forced by his necessities and the pressure upon him to sign the receipt, arid that he did not thereby intend to release, nor did he suppose he had released, any part of his claim not satisfied. Nor do we believe that the officer acting for the government supposed that the receipt would he au extinguishment of the amount unsatisfied. The circumstances surrounding the transaction would preclude that conclusion. The receipt and protest if not concurrent acts, were nearly so, and it cannot he pretended that the officers acting for the quartermasters’ department were ignorant of the amount and justice of the claim. There is no pretence that any consideration was given to move the claimant to relinquish the unpaid portion of his demand. The statement of account, to which the receipt is appended, exhibits the faqt that only a part of the service rendered was included in it. The balance due, as well before as after partial payment had been made, *116 was easily ascertainable by computation ; for that purpose the application of simple rules of arithmetic was all that was necessary. No dispute could well arise about the amount of indebtedness unless it was purely artificial and suggested for the occasion.
Upon the assumption of the Solicitor, that the receipt to the bill was a final release of all demands under the contract, the objections to that construction of it made by the counsel for claimant are valid. The words “ in full of the above account,” upon which the Solicitor relies to maintain his position, should be restricted to the subject-matter on which they are to operate, and that was “ the above account.” They are not like words of release standing alone without reference to any specific matter, to be taken most strongly against the releasor and not liable to explanation by extrinsic evidence, but they constitute merely a receipt of the particular account to which they are subscribed, and a receipt of that character is always open to explanation. The bill or account receipted was not for the full period of service, from the 17th day of June, 1863, which was 357 instead of 298 days, nor was it for the entire amount that was due for either number of the days ; it was but a partial statement of the account as it then really stood between, the parties, and there is no evidence in the record of any previous payment for the days of service not mentioned in the receipted bill. In support of this construction of the receipt we refer to the new work on contracts, by Metcalf, from which we make this extract: “A release of all demands, when a particular demand is acknowledged to have been received, is confined to the demand specified.” In 2 Rol. Abs., 409, it is said : “ If a man should receive ¿610 and give a receipt for it and doth thereby acquit and release the person of all actions, debis, duties, and demands, nothing is released but the ¿610, because the last words must be limited to those foregoing.” Lord Holt is reported to have denied this case in Rolle, but Lord Ellenborougli said he was sorry to find it had been denied to be law, because it seemed to him to be as sound a case as could be stated, and it is now, doubtless, the settled law of England and of this country. (Metcalf on Contracts, page 279, see also page 191.)
The Solicitor for the United States laid much stress upon the effect of the power of attorney given by the claimant to the Brookmans, which he has made an exhibit in the case, and insists that inasmuch as the power was coupled with an interest and expressly made irrevocable,, authorizing the Brookmans to settle and compromise, therefore the whole business was left at their absolute and exclusive control; *117 and that when they signed the receipt with the claimant its execution by them was, in effect, a compromise independent of any remonstrance the claimant could make, or however adverse to his interests. The requirement of the quartermaster, after he had been informed of the existence of the interest of the Brookmans, that they should join in the receipt, may have been a prudent precaution to avoid any future contest with them, but their signing was. not necessary to its validity; the power of itself could not affect the United States, it had no efficacy, it was null, and void, as being within the prohibition of the act of Congress of 26th February, 1863. (Brightly’s Dig., vol. 1, p. 132.) But suppose it were otherwise — and it appears that the officer acting for the United States and the claimant so regarded it — even then, the Brookmans could not in the presence of the claimant control his action, except so far as to secure themselves for their advanees, and if he was willing and had the means to repay them they could not claim anything more. The scope of the power, coupled with an interest, was in the nature of an assignment fro tanto. To that extent it might be effective in the absence or presence of the maker, but beyond that it should not operate. They were at most but his agents, bound at all times to observe good faith towards their principal, which they did not, if they designed to make a final settlement which relinquished to a solvent debtor more than half of what they must have known was justly due to Pratt. The presence of Pratt acting for himself ought to be sufficient to supersede any right under the power, except as we have stated. The word “irrevocable” in the fower, which the Solicitor considered so potent, did not add to its efficacy or extent. (See 3 Whea-ton, pages 201, 202, and 203.)
It is also urged by the Solicitor that the order of General Gillmore of the 6th of August, 1863, (already inserted,) directing that “ the Dirigo should be kept till further orders” within his department, was an impressment, or taking of the vessel under the right of eminent domain. Had the order referred to gone further and directed a seizure, or had there been a seizure in fact, there might be more force in the argument, but there was no attempt at seizure. The vessel, although kept within the department, was left in the custody of her owner, who managed her as he had done prior to that date, retaining his men and paying them. There was no change in the control of the vessel, but she was not permitted to depart; simply this and nothing more. That General Gillmore did not understand that the vessel had *118 been seized by bis order is very apparent from bis letter of tbe 16tb April, 1864, wbicb is an exhibit in tbe ease, and here copied:
“ HEADQUARTERS DEPARTMENT SOUTH,
“ Hilton Head, S. C., April 16, 1864.
“ Tbe Dirigo is fitted np with heavy lifting machinery, and was used in lifting and transporting heavy ordnance during our operations on Morris island. She was of great service to us, and, in my opinion, should be paid for her services according to the terms of the charter-party, and not be subjected to the rules governing transports that carry freight and passengers only.
“ Q. A. Gtllmore,
“ Major General.
“ True copy.
“ George D. Wise,

“ Col. Q. M. Dep’t., Brevet Brig. Gen. Vais’’

This does not presume that an impressment was made, or that any other measure of compensation for the vessel than that provided by the charter-party was contemplated by him.
The claim for the value of the hull of the Dirigo we do not allow. The claimant states in his testimony that he was aware from his “ earliest experience” of the danger and risk from the action of the sea-worm in the waters where he knew the vessel was to be used, and as he was willing to have her remain in those waters as long as he should be paid his price for her use, we think he took all the hazards of destruction by the sea-worm into consideration when he signed his charter-party.
If the price agreed to be paid for the use of the Dirigo was disproportionate to that for which she was offered on sale , to the United States, that fact does not disparage this claimant, who acted throughout with fairness and propriety. The defendants had the option to purchase or charter, and chose the latter. If there was error in the choice, let the blame rest where it properly belongs. This claimant had neither inclination, influence, nor power to control that action. Moreover the testimony all concurs to show that the price to be paid was fair and reasonable.
"We think the claimant should recover the amount withheld from him from the 17th day of June, 1863, to the 9th day of June, 1864, viz: $100 per day for 347 days, being $35,700, and direct that judgment be entered for that sum.