Casey, C. J.,
delivered the opinion of the court:
In July, 1861, General Frémont was appointed to the command of the department of the west, with headquarters at St. Louis, Missouri. He was invested with all the power the President and Secretary of War could confer in regard to raising, equipping, supplying, and organizing an army to repel the threatened invasion of the loyal western States, and for descending the Mississippi. He was without any definite instructions as to the general management of, or the adoption of any system of, military operations. These matters were intrusted to his own discretion.
As a part of the system which he adopted it was determined to fortify the city of St. Louis by a circumvallation of earthworks, constructed in accordance with a general plan previously laid out under .the direction of General Lyon.
About this time the claimant arrived in St. Louis from California. General Fremont had known him there as a competent and skilful contractor on streets, roads, &e. He at once sent for him, and requested him to make an, offer for the performance of the work as laid down by the plans of the engineers in the best and most expeditious manner. That interview led to the following proposal and contract :
“ St. Louis, September 4, 1861.
“The undersigned proposes to-build all the fortifications, redoubts, bastions, and all else required, of timber and earthwork, for the defence of the city of St. Louis, from fortification No. 6, at St. Malachi church, to the northern limit of the city — all to be done according to and under the direction of the engineer or engineers in charge of the work — binding myself to complete the work in five (5) days after the same is laid out, for the sum of three hundred -and fifteen thousand dollars, ($315,000.)
“B. L. BeaRD.
“ J. C. Frémont,

“Major General Commanding.”

*126 The answer of General Frémont to this proposition was as follows:
“ HEADQUARTERS, September 4, 1861.
“ In order to place this city immediately in a state of at least partial defence, I recommend the execution of a contract with Mr. E. L. Beard, who makes this proposition.
“J. C. Fremont,

“Major General Commanding.

“ Brigadier General J. McKinstry,
“ Quartermaster United Slates Army.”
(Claimant’s petition, p. —.)
On the 5th day of September a more formal contract was drawn up and signed by the claimant, and by General McKinstry on behalf of the United States. That portion of the last-mentioned contract which becomes material to this inquiry is as follows :
“For all excavations, forty-five (45) cents per cubic yard. For all earth embankments, fifty-five (55) cents per cubic yard. For all puddled earth, ninety (90) cents per cubic yard. For sodding the fortifications, embankments, &c., one dollar and fifty cents ($1 50) per yard. For paving walks and yards, floors of block houses, &c., one dollar ($1) per square yard, said pavement to be of the best quality of gravel pavements. For building all cisterns, tanks, &c., for holding water, twenty-five (2(5) cents per cubic gallon of two hundred and thirty-one (231) inches,'said cisterns to be of the best quality, complete, with arched brick cover, and cement finish. For all the timber and lumber used in building the block houses, magazines, &c., and quarters of officers and soldiers, sewers, &c., and all the labor used in constructing the same, (timber and lumber to he measured in the buildings, &c., after the same are completed,) one hundred dollars ($100) per thousand feet. For constructing all the fascines, breast-works, &e., required on the works, one dollar ($1) per cubic foot. For roofing all the buildings, four dollars and fifty cents per square of one hundred superficial feet, the same to be made of the best quality of three-ply gravel roof.” (Claimant’s petition, p. 5.)
The claimant entered upon the performance of his contract, and, as the evidence shows, completed it to the satisfaction of the engineers in charge and the general commanding. The whole work performed by him under the contract amounts, at the stipulated prices, to the sum of two hundred and ninety-eight thousand three hundred and twenty-six dollars and seventy-eight cents, ($298,326 78.) Of this sum he *127 has been paid the sum of one hundred and ninety-one thousand dollars, ($191,000.) He brings this suit to recover the balance he alleges to be due him under the contract, viz: one hundred and seven thousand three hundred: and twenty-six dollars and seventy-eight cents, ($107,326 78.)
The United States resist this recovery, and set up as matter of defence—
1. That General Fremont had no authority to bind the United States for such expenditures without the express authority of the President or Secretary of War.
2. That the quartermaster of the department had no lawful authority to make such a contract, but that it should have been made, if at all, by the engineer’s department.
3. That the prices allowed for the work in the contract are so extravagant and excessive as to be evidence that the claimant took advantage of the want of knowledge and skill of the quartermaster to obtain these exorbitant rates, or that they colluded together to the injury of the United States; and that in either event the contract is fraudulent and void.
The view which we take of the facts and the conclusions we have arrived at upon them relieve us from considering the legal aspects of the case, as presented in the first and second points above stated.
The evidence proves that this contract was made at a time when all business and enterprise in and around St. Louis, and indeed all over the country, was greatly depressed and prostrated.
The wages of labor and the prices of material were reduced to the lowest points. Any number of common laborers could be hired at eighty cents per day; mechanical and other skilled labor at ‡1 25 per day. Lumber could be purchased at twelve dollars per thousand feet, board measure. The evidence showed that the usual price for excavation and embankment of the kind here made was from fifteen to twenty-five cents per cubic yard; the contract allows from forty-five to fifty-five. The customary price for sodding, fifteen to twenty-five cents per square yard; the contract gave. $1 50. Fascines and gabions, twenty cents per foot; by the contract, one dollar. Lumber from twelve dollars to thirty dollars per thousand feet; the contract allowed one hundred dollars. All other prices were proportionately high.
The following comparative statement and table, made by General Cullom, of the corps of engineers of the army, from actual measurements on the ground, shows what would have been the cost of these *128 works at the customary prices, proved by tbe witnesses, and their cost under the contract McKinstry made with Beard :

Value of materials and, labor on forts and batteries.

These prices are much heyond the usual and customary prices paid by individuals for the same materials aud services. They are so extravagant and exorbitant that no prudent man, acting for himself in his own affairs, would agree to pay them, unless it were done under some mistake or delusion, of which it would he unfair and unconscionable for the other to take advantage.
Whether this exorbitancy of price resulted from the ignorance of McKinstry or his collusion with Beard, is equally fatal to the contract. The law requires the utmost fairness and good faith on the part of those dealing on public business with an officer. And whether the advantage has been gained by availing of their indifference, ignorance, or cupidity can make no manner of difference. In either case its effect upoD the contract is the same.
*129 Whoever will examine the acts of Congress passed to regulate the manner of making contracts on behalf of the United States, or of procuring the necessary supplies for the public service, will see how carefully and anxiously Congress has . endeavored to guard the public interests in this respect. Every precaution is taken against the ignorance or unfaithfulness of the officers intrusted with that branch of public duty, as well as to protect the government against the fraud and cupidity of contractors. As an important feature in this system, they have introduced a competitive -process so as to enlist the rival interests of different parties for the performance of public work, or the furnishing of public supplies. An exception to this system had necessarily to be made where the public exigency required the delivery of the articles or the performance of the service to be immediate ; and, therefore, not admitting of the delay of publishing proposals and securing competing bids.
■ But to throw every safeguard around the public treasury, the law wisely requires that in those instances “ the articles or service required may be procured by open purchase or; contract at the places and in ' the manner in which such articles are usually bought and sold, or such services engaged between individuals.” The reasons for both methods are apparent. By such restrictions Congress intended that supplies and services should be secured to the United States at their fair market value, and the customary prices at which they could be bought or hired by individuals.
These provisions, doubtless, had reference to the price of the article or services as well as their quality and efficiency. And the prices at which such articles could be bought or services engaged by other persons were at least intended as eriterions and guides to direct the officer, if not limitations to circumscribe and control his power in the premises.
Where individuals are acting for themselves, it is presumed that their own self-interest will excite their vigilance and guard them against mistake or imposition. In the case of a public officer, every presump'tion is to be made in favor of the fairness of his conduct, and of his fidelity to his public trust. Yet a court, whenever there are circumstances to excite suspicion, will look narrowly into the case and hold the party who seeks to enforce such a contract to fuller explanations and stricter proof of fairness than would be required between two individuals, sui juris, and each acting on his own behalf.
The proofs in this case show that the prices agreed to be paid for this work are grossly exorbitant. They are such as no discreet man, *130 acting in bis own affairs and paying out bis own money, would ever agree to. Gross inadequacy or gross exorbitancy of prices, sucb as no man advised of bis rights would give on the one band, and such as no honest man could conscientiously receive on the other, are universally acknowledged badges of imposition or fraud. And in all such cases it- lies upon the party setting up the contract, and seeking to enforce its provisions, to satisfy the court of the entire good faith of the transaction. This is pre-eminently so where this cloud of suspicious facts and circum*-stances hangs over a transaction with a public agent or officer.
The claimant has attempted to justify these prices by the facts that the work was to be done in five days after plans and specifications furnished, and the work should have been laid out; and that being compelled to keep the laborers at work night and day greatly increased the expenses. The confusion and disturbance of business and uncertainty incident to the opening months of the war, is also alleged as a reason why higher prices were stipulated for. While such reasons might have justified some advance in the usual prices, they could not account for the exorbitant increase contained in this agreement. An advance on customary prices of from 300 to 900 per cent, could not have been founded on any just calculations or basis of either the time in which the work was to be performed, or the circumstances and condition of the country; for the proof is that the actual performance of the work occupied about forty days or more, and that laborers were plenty, wages low, material abundant and cheap. And although the work was carried on both day and night no additional wages was paid on that account. The uncertainties and contingencies of the war could not have entered into the settling of the prices to any extent, as the work by the stipulations of the contract was to be commenced at once and finished within a few days. Nor was there then any serious derangement or depreciation of the currency. By the ordinary and customary prices the work should have been performed for about $60,000. At the contract prices, it amounted to almost $300,000. This difference is so great as to shock the moral sense of any fair-minded person. It necessarily leaves upon the mind the impression of imposition or collusion. These impressions have not been removed by the evidence laid before us. And as the claimant has already received more than three times the actual cost of the work, we feel that we do him no wrong in dismissing his -petition.
The judgment of court is that the petition be dismissed, and that the defendants go thereof without day.