Nott, J.,
delivered tbe opinion of tbe court:
Tbis is an action brought to recover $1,808 99, an alleged balance due upon tbe charter-party of tbe schooner Montezuma.
On tbe 8th February, 1865, Major General Oanby, commanding tbe “ Military Division of West Mississippi,” issued tbis order to tbe chief quartermaster of tbe "Department of the Gulf:” * * * * “If it be necessary to seize or charter any private transports, either steamer, sailing vessels, and barges, to carry out promptly tbe instructions given by Major General Canby, concerning tbe transportation of troops and supplies to Mobile and Pensacola Bays, you are thereby authorized and directed to cause tbe same to be done.”
Under tbis order tbe assistant quartermaster intrusted with its execution, Captain F. W. Perkins, chartered tbe schooner Montezuma, then at New Orleans, at tbe rate of $1,090 a month. Tbe charter-party took effect from tbe 18th March, 1865, and tbe schooner continued in service under it until tbe 22d January, 1866.
Before tbis charter-party was executed, tbe Quartermaster General bad fixed the limit of rates at wbicb vessels were to be chartered for tbe military service. Tbe rate of tbe Montezuma’s charter exceeded the ^Quartermaster General’s limit.
As was shown in tbe cases of BaJcer and Folsom and of Caleb, (3 O. Cls. B>., pp. 343, 351,) vessels could not be chartered at that time in New Orleans at tbe official rates; and, apart from the Quartermaster General restrictions, tbe amount agreed upon in tbis case was not unreasonable.
*404 On tlie 5th April, 1805, the Quartermaster General disapproved all the charters-party of those vessels, and directed that their compensation, be reduced to the official rates. It does not appear when this disapproval was communicated to the captain or owners of the Montezuma, nOr when their first demaud for payment was made.
After the schooner had gone out of service, a payment was made by the Quartermaster General at the rate of $693 a month, which was subsequently increased to $910 84. Both payments were received under protest and with an avowed intention of seeking the balance by legal redress.
It is insisted on the part of the claimants, and apparently conceded on the part of the defendants, that this case is identical with the cases referred to in 3 C. Cls. R., pp. 343, 351. But to the court there appears to be an important distinction. The contracts of affreightment there were sustained upon the sole ground that the vessels were chartered for a military emergency, under the express orders of the commanding general, and that their service in all things complied with the Act Uh July, 1864, (13 Stat. L., p. 394, § 4,) and did not continue beyond “the oontinucmce of the emergency.” In this case the service continued until long after the war had ceased. The other vessels left the service in June, 1865, but the Montezuma continued till January, 1866. The question, therefore, is, does the statute sustain such an agreement? We think not.
The words of the Aet “ to provide for the better organization of the quartermasters’ department,” (13 Stat. L., p. 394, §4,) are explicit and decisive:
“That when an emergency shall exist requiring the immediate procurement of supplies for the necessary movements and operations of an army or detachment, and when such supplies cannot be procured from any established depot of the quartermaster’s department, or from the head of the division charged with the duty of furnishing such supplies, within the required time, then it shall be lawful for the commanding officer of such army or detachment to order the chief quartermaster of such army or detachment to procure such supplies during the continuance of such emergency and no longer, in the most expeditious manner and without advertisement; and it shall be the duty of such quartermaster to obey such order.”
Apart from this statute and the order issued under it, the *405 claimants’ charter-party atéis wholly void. The assistant quartermaster at New Orleans had no right to contract Avithout the preAdous advertisement required by the Act 2d March, 1861, (12 Stat. L., p. 220,) and had no right to give an excessive compensation forbidden by his superior officer, the Quartermaster General. Of both the law and the fact the claimants were chargeable with knowledge. A special agent cannot exceed the instructions of his principal, and “the law of general and special agents is applicable to general and subaltern officers in their relations Avith the government and its contractors.” Stevens’ Case, (2 O. Cls. R., p. 638.) The charter-party, therefore, can be upheld only to the extent authorized by the statute, and the statute limits it to 'the continuance of such emergency and no longer
In the cases before referred to the evidence showed that the emergency had ended and the vessels were returned to New Orleans and discharged from service in the month of June. We are satisfied that the same course should have been pursued with this vessel, and that her charter-party could not have been continued, legally, longer. This ruling will sustain the legal existence of the charter-party from the 18th March to the 18th June, a period of three months. For that period the claimants may recover the difference between the price agreed upon “($1,090 a month) and the price paid, ($910 84.)
The judgment of the court is that the claimants recover of the defendants the sum of five hundred and forty dollars, ($540.)