Casey, Ch. J.,
opinion:
This case embraces two separate and distinct claims. These claims arise upon two several charter-parties with the United States, made at different times, and for the hire of different vessels.
The first claim set forth in the petition is for a part of the hire of the steamer Bebecca Clyde, and the proofs in the case show the following leading or ultimate facts:
The charter-party is dated on the 4th November, 1863, to take effect on the 26th October, A. D. 1863 — the day the vessel entered upon service. So far as is material to this case, the charter-party provided for the payment to the claimant of a compensation, “ the full and just sum of $300 per day for each and every day said vessel may be employed, and will furnish all fuel necessary for the navigation of the said vessel, until the said vessel is returned to the said party of the first part, in Philadel-delphia, in the same order as when received, ordinary wear and tear, damage by the elements, collision at sea and in port, bursting of boilers, and breakage of machinery excepted.” “Payable to the order of Thomas Clyde, at the quartermaster’s office in Philadelphia, monthly, upon presenting certificates of the duly authorized agent of the Quartermaster’s Department that the vessel has faithfully performed her part of this contract.”
The war risk was to be borne by the United States, the marine risk by the owner. This vessel in the charter-party was *144 recited to be of the burden of 446ff registered tons. This charter-party made between Captain A. Boyd, assistant quartermaster . at Philadelphia, and the claimant, was executed in quintuplícate, one copy of which was forwarded to the Quartermaster General, at Washington.
In March, or April, 1863, the Quartermaster General had caused circular instructions to be issued and sent to all his subordinates charged with the hiring of vessels, instructing them that the compensation then being paid was too high. They were therein directed to limit the compensation to from 40 to 50 cents per day per registered ton, or measurement, for steamers. On the 19th December, 1863, an assistant of the Quartermaster General, in charge of this branch of the service, wrote to Captain Boyd, approving a bill for the hire of the boat at $300 per day, from 6 a. m., October 26,1863, to November 24, 1863 = 29f days = $8,925, and added, u The rate of this vessel, if her services are required for a longer period, is deemed excessive, and will be reduced from the 20th December, 1863.” These instructions were communicated by Captain Boyd to the claimant; and on the 23d December, 1863, he responded. The material part of his answer is as follows: “ Her present charter ($300 per day) is reasonable, but, as she was built expressly for the New York and Richmond trade, if the government will keep her for four months, or till that port is open, I will reduce her to $200 per day from the 20th of this month.”
On the 4th January, 1864, the Quartermaster General’s Department wrote to Captain Boyd as follows :
“ CAPTAIN: It is not known by the department that necessity exists for retaining the steamer Rebecca Clyde in the service. Should she be required, and you can afford her constant employment, you can retain her at the rate authorized by the letter from this office of the 19th December; otherwise she should be at once discharged.”
To this letter Captain Boyd responded on the 5th of the same month:
u General : I have the honor to state, in reply to your letter of the 4th instant, that the steamer Rebecca Clyde was chartered to make two trips to Morris Island with conscripts from this city. On the second trip she was retained therefor service *145 in tbe department. Had sbe returned it was my intention to bave discharged her.”
On tbe 5th January, 1864, Boyd, tbe assistant quartermaster at Philadelphia, wrote to the Quartermaster General:
“ I informed you, under date of 23d ultimo, that Mr. Clyde, her owner, had consented to a reduction in her rate of pay from $300 to $200 per day, from the 20th December, 1863.
“Your letter of 19th ultimo directs a reduction of her pay, but fixes no rate. Is $200 per day satisfactory? ”
She remained in the service at Hilton Head, and in southern waters, until February 12, 3864. The claimant sent his general agent, Ashcroft, to Hilton Head, for the purpose of procuring the discharge of the vessel, for the reasons that the compensation was reduced to $200 per day, and because the worms in those southern waters were fast destroying the vessel. Upon his urgent demand and request, the vessel was discharged at the time stated.
On the 11th March, 1864, the claimant having procured the necessary certificates of service, received the pay on the following voucher, from Captain Boyd,- and gave to him a receipt “in full of the above account.”
“No. 78 ‘_B,’ March, 1864. ■
“ The United States
To Thomas Clyde, De
“ November 25, 1863, to January 2, 1864.
“ For services of steamer Rebecca Clyde, as per charter dated October 26, 1863, from November 25, 1863, to 12 m. January 2, 1864, as per certificate and sailing order annexed.
“ Twenty-five days at $300 per day, old rate.$7,500 00
“ Thirteen and a half days at $200 per day, new rate.. 2,700 00
10,200 00
“ I certify that the above steamer was borne on my report of persons and articles hired for the months of November, December, 1863, and January, 1864.
“A. BOYD,
uOaptain and Assistant Quarter master. ”
“ Received at Philadelphia, the 11th of March, 1864, of Cap *146 tain A. Boyd, Assistant Quartermaster United States Army, tbe sum of ten thousand two hundred dollars, in full of the above account.
“THOMAS CLYDE.”
And then, having procured further certificates of service from the 2d January, 1864, till the 12th day of February, 1864, as follows:
“No. 128 ‘B,’ April, 1864.
“ The United States
To Thomas Clyde, Db.
“ January 2, 1864, to February 23, 1864.
“For services of steamer Rebecca Clyde, as per charter, dated October 26,1863, from 12 m., January 2, 1864, to 12 m., February 23, 1864, as per certificates hereto annexed.
“Fifty-two days, at $200 per day.$10,400 00-
“I certify that the above steamer was borne on my report of persons and articles hired for the months of January and February, 1864.
“A. BOYD,
“ Captain and, Assistant Quartermaster.”
“Received at Philadelphia, the 13th of April, 1864, of Cax>-tain A. Boyd, assistant quartermaster United States Army, the sum of ten thousand four hundred dollars, in full of the above account.
“(Duplicate.)
“ THOS. CLYDE.”
And on April 13th, 1864, he received this sum of $10,400, and gave, as before, a receipt “ in full of the above account.”
So far as the evidence shows, these accounts were acquiesced in by the claimant, and the receipts given without objection or protest.
This same vessel was, on May 29 th, 1S64, again chartered to the United States, at $200 per day. And again on the 22d February, 1865, rechartered to the United States, at forty-five cents per ton per day.
In another count in the petition the claimant alleges that his steamer called Emilie, on the 5th of March, 1863, entered into the service of the United States, under a due and lawful charter- *147 party. That by the terms of tbe charter-party, the Dnited States agreed to pay him the sum of $350 per day for each and every day said vessel was retained in the service; that the vessel remained in such service until August 13,1863, when a new charter-party was executed. And that on or about July 3d, 1863, the Quartermaster General arbitrarily and against the protest of the petitioner reduced the rate of compensation from $350 per day to $200 per day, and directed that such reduction should take place from May 5th, 1863, and that for a period of seventy-five days he was paid, to his great wrong, at such reduced rate of compensation.
This vessel was chartered by Lieutenant Colonel Herman Biggs, quartermaster at New Berne, North Carolina, at the time stated. On the 18th March, he inclosed a copy of the charter-party to the Quartermaster General, (p.43.) On the 9th April, 1863, the Quartermaster General wrote to Quartermaster Biggs, disapproving of the rate of compensation, and the valuation named in the charter, which was $65,000. He directed her compensation to be reduced to $175 per day, and her valuation to a sum not exceeding $25,000. On the 22d April, 1863, Quartermaster Biggs inclosed a copy of the letter of the Quartermaster General to Mr. Ashcroft, the agent of Clyde the owner, and received from him a reply dated on the same day. In that reply he stated that, in view of the great burden of expense under which the nation was groaning, he was willing to reduce the per diem compensation to $300 per day, after the 5th May, 1863, “provided the government agree to keep her in service for the term of not less than four months.”
On the 23d April, 1863, Colonel Biggs directed his assistant, Colonel Hoffman, to reduce her pay to $175 per day, or discharge her. On the 24th of the same month Colonel Hoffman replied that a military necessity existed for detaining the vessel, and that she would necessarily be detained under the orders of General Foster, commanding the department, for two or three weeks while the garrisons were being changed. On the 24th April, 1863, General Foster wrote to the Quartermaster General as follows:
“ Headquarters 18th ARMY Corps,
“ New Berne, April 24,1863.
“ Geheral : I have the honor to inclose copies of correspondence in relation to the charter of the steamer 1 Bmiliel
*148 “ I would respectfully recommend that tbe reduced terms offered'by tbe agent of tbe vessel be accepted by tbe Quartermaster's Department, on account of tbe carrying capacity of tbe steamer, ber light draught of water, and consequent great usefulness in these waters, as well as ber sea-going qualities, which render ber equally useful in sending ber in cases of emergency to Fortress Monroe.
“ I am, general, very respectfully, your obedient servant,
“j. g. F0st.ee,

u Major General Commanding.

u General M. 0. Meig-s,
“ Q. M. G. U. 8. A., Washington, D. G.n
On tbe 22d June, 18G3, Captain E. C. Webster, quartermaster at New Berne, wrote to Mr. Ashcroft that, by order of tbe Quartermaster General, tbe compensation of tbe Emilie would be reduced to $175 per day from and after tbe 9th April, 1863. On the following day Ashcroft -replied, protesting against service for less than $300 per day, and asking for tbe discharge of tbe steamer.
On tbe 19th July, 1S63, tbe steamer was discharged. Sbe was paid at tbe rate of $350 per day from tbe 5th of March until tbe 5tk May, 1S63, and from that day until ber discharge at tbe rate of $300 per day.
On tbe 13th August, 1863, this same vessel was chartered again to tbe United States, at tbe rate of compensation of $200 per day, with the accruing and purchasing claifses contained in tbe charter-party.
The services of tbe boat from May 5th, 1863, to July 19th, 1863, upon certificates of service, and approval of tbe Quartermaster General's Department, were paid on tbe following voucher and tbe receipt appended given :
“No. 322 1 Bf December, 1863.
“The United States
To Charles D. Ashcroet, Dr.
“ May 5 to July 19, 1863.
“ For services of steamer i Emilie,’ as per charter, dated March 5, 1863, from May 5 to 3 p. m. July 19,1863, as per certificates hereto annexed, being 75-'-f days, ® $300 per day...$22, 687 50
*149 “Also, one day, April 5, 1863, as per certificate hereto annexed. $350 00
23,037 50
“Deduct for May 5, paid on last certificate. 350 00
22, 687 50
“ Approved.”
“ Deceived at Philadelphia, the 31st of December, 1863, of Captain A. Boyd, assistant quartermaster United States Army, the sum of $22,687 50, in full of the above account.
“CHAS. D. ASHOBOFT.”
This bill had been previously approved 3d December, 1863, by the Quartermaster General. (See his report, Eecord, p. 9.) No objection or protest was made to this voucher or the receipt of the money at the time, and no additional demand has ever been made upon the War Department for any part of the claim set up in this case.
The evidence shows in both cases — the Bebecca. Clyde and the Emilie — the claimant acquiesced in the reduction of the rate of compensation, and received the pay at those reduced rates without objection or protest.- It was clearly and distinctly the acceptance of such reduced pay as the compromise and settlement of a disputed and doubtful claim.
In the case of The United States v. Adams, (7 Wall., 477,) the Supreme Court of the United States fully recognize the power and right of the head of an executive department, where satisfied that the public interests require it, to suspend the execution of a contract or the payment of money under it. And when the claim is so suspended, it becomes a dispute which is the subject of compromise. And where the government proffers, and the other party accepts voluntarily, without duress or compulsion, a stipulated sum in payment of a larger claim, it constitutes a settlement and compromise between the parties. And courts will not' disturb such amicable arrrangements, unless it is shown that undue or unfair advantage was taken of the party complaining. In the case cited the settlement and compromise was affected through a commission, appointed without any direct authority of law. But that does not vary the principle or its application. An adjustment by and a com *150 promise with, the officers of the department, have precisely the same validity, and neither more nor less; for in each case it must rest upon the consent, acquiescence or agreement of the parties. And the means or instrumentality by which their minds were brought to this accord is of no manner of account. These elements are as strong in this case as in that quoted, and the proof of acquiescence and consent much more clear and decisive.
In the case of Beard v. The United States, (3 C. Cls. R., 122,) we held that “groat exorbitancy of price in public contracts necessarily implies imposition or collusion.” And that, whether such exorbitancy results from advantage taken of the ignorance, or from corrupting the integrity of an officer, is equally fatal to the claim or contract. We hold there that the utmost fairness and good faith is required on the part of those dealing with a public officer.
The cases of Baker and Folsom and of Calebs (3 C. Cls. R., 343-351) bear only a slight resemblance to this case. When the reduction in those cases was ordered, the claimants instantly demand a discharge. They were discharged; and it was sought to make the reduction retroactive. When payment was made at the reduced rates the claimants protested. They followed it up with a prompt presentation of the claim for the balance withheld. When payment of that was denied, they brought suit at once. There was not the slightest consent or acquiescence. Besides, these vessels’ had been chartered for a special military emergency, under orders from General Oanby, according to the Act of 4th July, 1884, §4.
So in the case of L. B. Pratt v. The United States, (3 C. Cls. R., 105,) when it was attempted to reduce the compensation of his vessel, he at once filed a written remonstrance and demanded its discharge. This being refused, he followed it up with clear, distinct, written protests against her retention and the reduction of her pay. When finally paid he filed in the Quartermaster General’s office a distinct and earnest protest, ■with notice that he would claim his contract rate of pay.
So likewise in the case of Emery & Blake v. The United States, (4 C. Cls. R., 401,) we held, upon full consideration, that where a charter-party was made by a subordinate officer at rates exceeding those prescribed by the Quartermaster General, which was disapproved by the latter and a reduction ordered, *151 ■and tbe owner, after notice of these facts, voluntarily permitted his vessel to remain in the service thereafter, that he could only recover at the reduced rate.
This principle we have recently reaffirmed in the case of Thomas Clyde for compensation of steamer Tallaeca (not yet reported.)
In the case of Sarah 1. Daugherty v. The United States, (not yet reported,) where certain premises Avere leased by claimant to the United States at a monthly rent of $300, and the department reduced it to $200 per month, against the objection of the claimant, she afterward from month to month received the rent at $200 per month and gave receipts in full. After some time she applied to have the original rent restored. It was refused. And thereuimn she continued to receive and receipt for the rents at $200 per month till the end of the occupation of the premises by the United States. She then brought suit to re-cover the difference between the stipulated rent and the amount paid her. We held that these facts proved a consent and acquiescence to tbe reduction of the rent, and the claimant failed to recover.
These cases, Ave think, furnish us a safe guide and sound principles for the decision of these cases. The highest considerations of public policy require, that, after the executive officers of government have fairly and fully settled and adjusted disputed matters of claims or accounts with persons dealing Avith the United States, each party fully acquainted with their respective rights, such settlements should be sustained. Whenever such adjustments and compromises are free from fraud, oppression, or compulsion, they ought not to be disturbed; for where such settlements and arrangements have been made, vouchers made out in pursuance of them, the balances found due paid, and receipts and acquittances in full given, Avithout objection or remonstrance, such circumstances furnish the strongest, clearest, and best evidence of free consent and acquiescence.
The justice and propriety of the Quartermaster General’s conduct in reference to the hiring of these water transports was fully vindicated by the result; for the evidence shows that the claimant was not only ready but eager to recharter both these vessels to the United States at the reduced rate of compensation, and with other provisions vastly more favorable to the government than had been the old charters Avith the higher' rates. *152 This shows that the reduced rates were the full value of the ■services and more than could be .made in other employment. It moreover shows that there was no oppression, wrong, or injustice inflicted on this claimant, and others like him, by the officers of the United States in these cases. Satisfied that the government officers charged with the hiring of these vessels had either been deceived or debauched, it was the duty of the Secretary of War and of the Quartermaster General to take prompt measures to avert the consequences. Nor do I think, speaking for myself on this point, that in such circumstances they were put to the alternative of imperiling' the existence of the nation, by discharging the means of transport of its troops, or of bankrupting its treasury and wasting its resources by the payment of the unconscionable and exorbitant rates of compensation which weak or wicked subordinates had stipulated for. In such cases, where the United States could not without peril discharge the vessel, and at the same time could not pay the stipulated hire without submitting to injustice and extortion, I do not think they were bound to do either. The law would furnish a rule for a fair and just compensation, and neither would be wronged.
On this subject the Supreme Court of the United States, in the case of Theo. Adams, already quoted, after saying that injustice in individual cases may be done by arresting payment and settlement of account, says:
“But this is no argument against the power or right of the heads of the departments to refuse the payment. What other-remedy has the government to arrest the execution of fraudulent contracts, made by its subordinates, or the unfaithful execution of them ? In such cases the courts are open to protect the rights of private individuals, but this remedy is unavailable to the government. The multitude of agents, official and otherwise, which it is obliged to employ in conducting its affairs, render this remedy utterly impracticable. Unless, therefore, some' power exists in the government, summarily, to interfere, and arrest the frauds and irregularities committed against it, they must be allowed to go on to consummation. No one, we think, on reflection, will deny this power.”
If, notwithstanding the evidence, clear, distinct, and full, presented in this case of settlement and compromise, we are bound to overhaul these transactions, no public account can be con *153 sidered as closed. All tbe vast accounts of this government may be ripped up and made the subject of litigation in this court. And the whole financial system of the nation would be-thrown into uncertainty, disorder, and confusion.
This matter was arranged and accommodated in a way and upon principles that were just and fair to both parties. The evidence leaves no doubt that it was entirely satisfactory to each of them at the time. And we best subserve the cause of' public justice and good morals by holding them to their compromises.
The judgment of the court is that the petition be dismissed..