Casey, Oh. J.,
delivered the opinion of the court:
In July 1864 Major General David Hunter, of the United States Army, was in command of the military department of which West Virginia was a part. To meet a pressing exigency he issued orders to his chief quartermaster, on the 7th July, 1864, to procure 1,000 horses within seven days. A board of officers was designated as inspectors of these horses. The orders limited the price to $165 per head. A similar order for an additional 1,000 horses was issued by General Hunter on the 13th of the same month, at the same price stated before. The quartermaster procured the claimant and others to deliver the horses. They were delivered within the time specified, or very shortly thereafter. The horses delivered were all inspected by the officers detailed for that purpose, and accepted by them on behalf of the United States. Vouchers were then made out, specifying that the claimant had delivered so many horses at $165 per head, and carrying out in figures the aggregate, the certificate of the board of inspectors, and the approval of the quartermaster added to the same. To the whole was added a receipt, (with blanks left for date, and the name of the paying-officers,) stating the amount in words of the aggregate of' the voucher at $165 per head for the horses. These receipts were signed by the claimant and others who delivered horses under these orders, and for each delivery separately. The vouchers, certificates of inspection, approval of the quartermaster, and receipts were all the same, varying only in amounts according to the number of horses delivered'.
Neither General Hunter nor- his quartermaster had been furnished with money to pay for these horses. The parties to whom these vouchers had been given procured the money on them from the banks at Parkersburg, West Virginia, and various individuals, to pay for the horses to the farmers from whom they were bought. The vouchers, with the receipts in *391 full appended, sigued by the claimant and the other contractors, were handed over to the banks and the individuals from whom the money had been procured, to enable them to draw it from the treasury. Some of the vouchers were forwarded to Biggs' & Co. and Jay Cooke & Co.,, and others sent direct to the Quartermaster General’s office for payment. Those sent to Biggs & Co. and Jay Cooke & Co. were also deposited in the same place for settlement and payment. They were referred to the cavalry division of that Bureau, which reported that the price paid for the horses was too high, and stated that the market price of horses at that time was from $145 per head to $155. The Quartermaster General thereupon referred the matter back to the cavalry 'division, directing that the claims should, if practicable, be settled with the holders of these vouchers, at $150 per head for the horses. The head of that •division thereupon caused a deduction of $15 per head to be made. The vouchers being in his possession, the deduction was stated in red ink upon their faces, and a new balance struck. He also caused the sums written in the receipts, at the bottom of the vouchers, to be erased, and interlined instead the reduced balance, after deducting $15 per head for the horses specified in the particular voucher. He then made •out checks or drafts on the treasury for these reduced sums, ■and sent or handed them to the holders of the vouchers or their agents. The payments were made at various times between the 23d of May, 1865, and August 12,. 1865.
During the time that the question.'of the allowance of the vouchers was before the War Department, several officers of the banks owning part of these vouchers, as well as agents of the individual holders, demanded the payment and allowance of the vouchers, and protested against any reduction beings made upon the same to the Quartermaster General and Secretary of War. They gave notice to those officers that any payments of less than the face of the original vouchers would only be received in part payment, and that they would look to •Congress or the Court of Claims for the balance. Those officers •concurred that they would not be barred of any just demand they had to claim the balance by the adjustment ordered in the Quartermaster General’s office.
The horses were purchased under a lawful order of an authorized officer of the United States, during a pressing military *392 exigency. The price paid was a fair and reasonable one, under the circumstances, and we find no fraud in the transaction, either on the part of the officers or claimants.
We also find that the alterations in and deductions from the vouchers, and the erasures and interlineations in the receipts, ivere made after they were signed, without the consent or acquiescence of the holders. There is no proof in the record that the owners or holders of these vouchers either expressly or impliedly agreed to receive the reduced sums paid in full of their claims, but have always insisted upon payment of the entire sums.
These facts require but little elaboration. They make the questions of law but few, and tliose very plain. The act of July 4, 1864, “to provide for the better organization of the-Quartermaster’s Department,” makes the general commanding an army or detachment the sole judge of where an emergency exists; and his order during the continuance of the emergency authorizes the quartermaster to procure supplies in the most expeditious methods, and without advertisement. “ And it shall be the duty of such quartermaster to obey such order,” says the-law. In Baker v. The United States, (3 C. Cls. R., 351,) we held that the commanding general was the sole judge of when the-emergency exists; and that no other officer could interfere with-his orders in the premises. This construction is recognized and approved in Emery v. United States, (4 C. Cls. R., 404-5.) We-have seen no reason to change our A-iews upon this subject but we think every reason of public policy, convenience, and safety requires that the power of the responsible officer in such circumstances shall be upheld and maintained. When public peril impends, the officer charged Avith the duty of averting it possesses powers equal to his responsibilities; and the safety of the State is not to be weighed in the same balances with the price of supplies. The supplies are indispensable — cost what they may. Every precaution against unnecessary exorbitancy in price should be taken consistent with the utmost certainty and expedition in .obtaining them. There is no evidence in this record that this was not done. In the absence of such proof, we are to presume that these officers performed their duty legally and faithfully. If they did, then they had taken care that the price paid for these animals, considering time and place and cir *393 cumstance, should be fair and reasonable; and such is our opinion from the evidence in the case. Neither the Quartermaster-General nor any of his officers had any right to interfere with their contracts, without the consent of the other parties. This, consent has not been shown by any competent proof in the case.
The Attorney General has pressed with great earnestness, upon us that the receipts in full appended to the vouchers are-evidence of the payment; that there was a dispute, and that the reduced sum was paid and receipts given in full satisfaction of the claim; but the fact does not bear out or sustain the-argument. The reduction was arbitrarily made without the-consent of the claimants. The vouchers given them were-changed and scaled down against their remonstrance. The receipts which they had signed for the full amount of their claims were erased and interlined without their knowledge, authority, or assent. It is true, a receipt is prima facie evidence of the payment of the sum stated in it, and a receipt in full of a designated account is evidence of the full and final adjustment of the matter to which it relates. 'But it is only prima facie and liable to be overthrown by any evidence which shows, that it is not in fact what it purports to be. So here this receipt in full is prima facie of the payment of these accounts. But when it is shown that the receipt was changed and altered in a material respect after it was signed, and made entirely different from what it was before, its value as evidence is destroyed. It then lies upon the party setting up that receipt to show that the alteration was made with the knowledge, consent, or acquiescence of the party who is to be affected by it. If he fail in this, it goes for naught. That is exactly the position of things here. There is not in these records any evidence that these claimants in anyway assented to or authorized the alterations in these vouchers and receipts. On the contrary, throughout the whole negotiations they have insisted on their right to the face of these vouchers. There is not a spark of evidence of the compromise of the matter, as a doubtful or disputed claim. The reduction was the mere ex parte, unauthorized act of the United States officers, the other party neither giving previous consent nor subsequent acquiescence and ratification. The receipt of the amount paid was received expressly as part payment and with full notice that the balance would be claimed *394 from Congress or the courts. We have no doubt that the officers who made these reductions acted from proper motives and considerations of public policy, but we have as little doubt that they were mistaken in the extent of their own authority and power, as well as in their views of the policy of the Government. Due economy in the administration of public affairs is •a virtue as commendable as it is rare, especially in times of war and public commotion. But that is mistaken and wasteful economy which would save a few dollars at the expense of violating the plighted faith of the nation, or by doing wrong and injury to its citizens. We think this was a fair and honest contract for these horses. The officer who made it had full authority to do so. Nor under all the circumstances can we say that the price was exorbitant and unconscionable. The Quartermaster General had no right to scale it dcnvn without the consent of the claimants; that consent was not given. The full amount due under the contract was not paid, and no sufficient reason has been given why it should be withheld. We therefore find in favor of the claimants.