Casey, C. J.,
delivered the opinion of the court:
The claimants are residents of the city of Philadelphia. They were, in the winter'of 1865, the owners of the brig Edwin H. Fitler, which they despatched on a voyage to New Orleans. At the date of her arrival there the expedition against Mobile was being fitted out by General Canby. That officer, on the 8th of February, 1865, had issued orders to seize, if necessary, all steamers and sailing vessels requisite to transport the troops, munitions, and supplies. These orders were transmitted to Colonel Holabird, the chief quartermaster of the Department of the Gulf, and by him to Captain F. W. Perkins, in charge of water transportation. To prevent the seizure of the vessel under these military orders, Jeremiah H. Holmes, the master of the vessel, entered into a written charter-party, with Captain Perkins, for the hire of the same, at the stipulated price of $150 per day for each and every day the vessel should be employed, the United States furnishing the necessary fuel. This contract was dated the 28th February, 1865. The brig immediately entered upon the stipulated service, making several voyages to Mobile and return to New Orleans, under orders of the military authorities of the United States. Captain Perkins transmitted a copy of the contract to the returns office, with the order of General Canby directing the procuring of transportation. And he also transmitted -a copy of the same to the Quartermaster General. The latter officer disapproved of the contract, because the rate of compensation allowed was greater than the scale of prices established by the quartermasters’ department. This disapproval was on the 11th April, 1865, and was sent and notified to the quartermaster at New Orleans. The brig arrived at New Orleans on the 29th of May, 1865, and the master of the brig was *350 notified of tbe action of tbe Quartermaster General, and that be would be paid at the reduced rate of service ordered. This be refused to accede to, and asked to have the vessel discharged from the service. She was detained until tbe 1st day of June, and then released. Captain Perkins, in accordance with the instructions of the Quartermaster General, paid to the master of the vessel $9,225, or at the rate of $100 per day, for 92J days. They claim in this suit the remaining $50 per day, stipulated to be paid them by the charter-party, up to the 29th of May, and at the rate of $150 per day for the remaining three days the brig was detained. The questions discussed on the trial here were, whether the quartermaster at New Orleans had power to make the written contract, and whether the Quartermaster General could exercise a supervision over it, when made, by reducing the amount or rate of the stipulated compensation.
Subordinate officers frequently make contracts of this character, subject to the ratification or approval of their superiors, and where they do so, there can be no doubt that the transaction is- subject to and dependent upon the stipulation. To make it binding as an express contract, such approval or ratification must be first obtained. But where a public officer, with full power to enter into contracts, makes an absolute agreement, and submits it to his superior officer, in the due course of official duty and routine, I am not aware that the law confers upon the latter any power of revision or amendment. Such a power would be totally inconsistent with the promptness and despatch necessary in the movements of an army operating at remote points ' from the seat of government. The present is a fair illustration of how such a rule would operate. The contract was made on the 28th of February. The disapproval of tbe Quartermaster General is dated on the 11th of April, following. And that disapproval is notified to the quartermaster at New Orleans some time in the May following, when the objects of the expedition had been fully accomplished.
We think Captain Perkins, acting under the orders of Colonel Hol-abird, the chief quartermaster of the department, who was obeying the instructions of General Canby,. in command of that military department, had full power-to make the contract. There is nothing developed in the facts to cast any suspicion of fraud or unfairness upon the transaction. On the contrary, the evidence satisfies us that it was made in good faith, and that the compensation allowed under all the Circumstances was reasonable and fair. We find neither in the .contract nor in the facts or the law a,ny right or authority of the Quartermaster General to subject this contract to the procrustean pro *351 cess by conforming it to any special standard he had established. We think it comes within the words, and certainly within the reason and spirit of the fourth section of the act of July 4,1864, “ to provide for the better organization of the quartermasters’ department,” which enacts :
“ That when an emergency shall exist requiring the immediate procurement of supplies for the necessary movements and operations of an army or detachment, and when such supplies cannot be procured from any established depot of the quartermasters’ department, or from the head of the division charged with the duty of furnishing such supplies within the required time, then it shall be lawful for the commanding officer of such army or detachment to order the chief quartermaster of such army or detachment to procure such supplies during the continuance of such emergency, and no longer, in the most expeditious manner, and without advertisement; and it shall be the duty of such'quartermaster to obey such order.”
This makes the commander of the army or detachment, whose movements are to be provided for, the sole judge of when the emergency exists. And the law is not so lame and impotent in its conclusions as to allow the plans of a campaign to be thwarted, nor an army paralyzed in its movements by requiring a commander to wait for necessary transportation and supplies until all the contracts for their purchase and procurement have been submitted to and approved by the Quartermaster General.
The contract was made in this case and fulfilled by the claimants in good faith, and we can see no reason founded in justice or law why they should not be paid according to that contract.
We therefore find for the claimants, and direct a judgment in their their favor for the sum of $5,062 50.