Dbake, Ch. J.,
dissenting:
I dissent from so much of the opinion of the majority of the court as relates to the contract of July 18, and the counter-claim growing out of it. In my judgment, the claimant has no cause of action under that contract, and the defendants have a just right in law to recover back money illegally allowed and paid him on claims connected with its performance.
I will briefly recall the circumstances under which that contract was entered into,eas set forth in the finding of facts. In the summer of 1864, the troops under Brigadier-General Thayer’s command, in the Indian Territory south of Kansas and west of Arkansas, were cut off from any base of supply of grain, and were compelled to rely solely upon grass and hay for the support of their animals. Grass was very abundant there, and hay could have been put up as late as the last of October. Owing to this condition of things, and as well to provide hay for present use as for the ensuing fall and winter for the posts in General Thayer’s command, the contracts sued on were entered into; that of June 20 for the supply of Fort Gibson, and that of July 18 for the supply of Cabin Creek and Hudson’s Crossing. The former was entered into after the quartermaster had advertised for proposals; the latter without any advertisement.
*539 As to the latter, two questions arise: 1. Whether'the quartermaster had lawful authority to make a contract without advertisement; and, 2. If he had, whether he had lawful authority to bind the Government to furnish military protection to the claimant, in the terms contained in the contract.
The determination of the first question involves the consideration of two acts of Congress, viz, the tenth section of the Act March 2, 1861, (12 Stat. L., 220,) and the fourth section of the Act July 4, 1864, (13 Stat. L., 394.)
The former is in these words : “ That all purchases and contracts for supplies or services in any of the Departments of the Government, except for personal services, when the public exigencies do not require the immediate delivery of the article or articles-or performance of the service, shall be made by advertising a sufficient time previously for proposals respecting the same. When immediate delivery or performance is required by the public exigency, the articles or services required may be procured by open purchase or contract, at the places and in the manner in which such articles are usually bought and sold, or such services engaged between individuals.”
If this statute is to be considered applicable to the case, then we are to receive two points in regard to it as settled by the Supreme Court in Speeds Case, (8 Wall., 77,) viz: 1. That while, as a general rule, it requires an advertisement, still it invests the officer charged with the duty of procuring supplies with a discretion to dispense with advertising, if the exigencies of the public service require immediate delivery; and, 2. That where a discretion of this kind is conferred on an officer, and a contract is made in which he has exercised that discretion, the validity of the contract cannot be made to depend on the degree of wisdom or skill which may accompany its exercise.
It will be observed that the contract in that case was for work to be done by the claimant in slaughtering and packing hogs furnished to him by the Government for that purpose, and it was entered into by the authority of the Secretary of War; while in this case the contract was for the delivery of stacked hay, and was entered into by an assistant quartermaster. In the former case work was to be paid for as work; in the latter, no work was to be paid for as such, but the hay was to be paid for at a certain rate “ for each and every ton delivered and accepted.” The question, therefore, of contracting for work is not in this case, but simply one of delivering a given quantity of hay.
*540 I do not' deny that the quartermaster, if this statute applies, had a discretion to dispense with au advertisement, if the public exigencies required the “ immediate” delivery of the hay. What does “ immediate” mean there? In ordinary parlance it means, “not deferred by an interval of time; present; instant(Webster";) but clearly that is not its imperative meaning in this statute; for it would in many cases be*a physical impossibility to comply with it. Neither the claimant nor any other man or body of men could have made immediate delivery of 4,000 tons of hay, half at a point 55 miles and half at a point 85 miles from the place where the contract was made. “Immediate,’’ then, must be construed with reference to the particular facts of each case arising under the act. If the supply needed in an exigency can be purchased and obtained on the instant, the quartermaster has no right to contract for its delivery at a future period.^ If, however, as in this case, instant delivery be impossible, then, as I take it, the contract, to be justified by the statute, must be for a delivery at the earliest time practicable under the circumstances, upon the assumption that the contractor will immediately set about obtaining and furnishing the article, and that it will be furnished as soon as it can be, in the steady exercise of due diligence on his part, from the date of the contract until delivery. In such case the element of first importance, and in my judgment indispensable, to create liability on the part of the Government, is the immediate commencement of suitable effort to fulfill the contract. The statute authorizes a contract without advertisement only when “immediate delivery is required by the public exigency;” that is, by a state of urgent or exacting want demanding immediate supply; and the existence of such exigency utterly forbids the idea that a contract for delivery at a distant day could have been dictated by an exigency requiring immediate delivery. And this view was unanimously held by this court in McKinney's Case, (4 C. Cls. R., 537,) where damages were claimed for breach of contract for wood, made on the authority of the chief quartermaster of the Army of the Cumberland, in the midst of a pressing exigency for that article, but calling for its delivery at a future time. The court said: “ The evidence shows that an exigency for wood existed when the contract was made, but the contract shows that it was not made to meet that exigency, for it was made on the 1st of December, 1864, for the delivery of wood from the 1st of March *541 to tbe 1st of May, 1865.” That, in my judgment, is the true view, and should be applied to this case, where the contract was made on the 18th of July for a delivery to commence by the 10th of August and to be completed by the 2oth of September — 23 days to start and 46 more to keep on, making 69 days allowed for effecting an immediate delivery required by a public exigency! The mere statement of such a case seems to me to display its weakness. I can see no possible justification of the quartermaster’s action. In my judgment he either did not know his duty, or willfully disregarded it. ' In either view his contract was void, and cannot, under the Act March 2, 1861, serve as a foundation for this action.
If it be supposed that the tenth section of the Act July 4, 1864, authorized such a proceeding on his part, there is a twofold answer: 1. That the claimant’s counsel earnestly objected to that statute being considered to have any bearing on the case; and, 2. That, in'fact, it furnishes no authority for the quartermaster’s action; as 1 will endeavor to show.
That section is in these words: “ When an emergency shall exist, requiring the immediate procurement of supplies for the necessary movements and operations of any army or detachment, and. when such supplies cannot be procured from any established depot of the Quartermaster’s Department, or from the head of the division charged with the duty of furnishing such supplies, within the required time, then it shall be lawful for the commanding officer of such army or detachment to order the chief quartermaster of such army or detachment to procure such supplies during the continuance of such emergency, but no longer, in the most expeditious manner, and without advertisement; and it shall be the duty of such quartermaster to obey such order; and his accounts of the disbursements of moneys for such supplies shall be accompanied by the order of the commanding officer as aforesaid, or a certified copy of the same, and also by a statement of the particular facts and circumstances, with their dates, constituting such emergency.”
Now, what wa.s necessary to authorize a commanding officer of an army or detachment to exercise the large authority conferred, by this section? Three things were required, namely: 1. The existence of an emergency requiring the immediate procurement of supplies; 2. That the emergency should require that immediate procurement for the necessary movements and *542 operations of bis army or detachment; and, 3. That the needed supplies could not, within the required time, be procured from any established depot of the Quartermaster’s Department, or from the head of a division charged with the duty of furnishing the same.
Those are the circumstances constituting an emergency authorizing the commanding officer to avail himself of the summary power conferred by that section. In reference to the exercise of that power, the following points, except the sixth, have been decided by the unanimous judgments of this court, none of which were appealed from:
1. That to the commanding officer of the army or detachment is left the question of the existence of the emergency authorizing the immediate procurement of supplies without advertisement. (Henderson's Case, 4 C. Cls. R., 75.)
2. That he is the sole judge of the existence of the emergency. (Baker & Fulsom’s Case, 3 C. Cls. R., 343; Emery & Blake’s Case, 4 id., 401; Wilcox’s Case, 5 id., 386.)
3. That his orders in the premises are, as to the existence of the emergency, conclusive upon the officers charged with obtaining the supplies. (Henderson’s Case.)
4. That without his authority a quartermaster would have no lawful authority to contract, without advertisement, for future supplies. (Henderson’s Case and Emery & Blake’s Case.)
5. That the commanding officer’s authority to give an order for the immediate procurement of supplies, without advertisement, continues only so long as the emergency exists. (Emery & Blake’s Case.)
6. That the order of the commanding officer, in such emergency, must be to procure the supplies in the most expeditious manner and without advertisement.
7. That under such an order a contract could not bo made extending beyond the period of the existence of the emergency. (Emery & Blake’s Case.)
8. That he who contracts with a quartermaster for the delivery of supplies, without advertisement, is bound to know whether the proper commanding officer has declared the emer gency, and authorized the officer making the contract to dispense with the advertisement. (Henderson’s Case.)
Applying these rules to the present case, let us see how the matter stands.
*543 Iu the first place, let it be noted that the question is not whether this court is bound to infer, or may infer, from General Thayer’s order of July 17, that an emergency existed requiring the “immediate procurement” of 2,000 tons of hay at Cabin Creek, and 2,000 tons at Hudson’s Crossing. If General Thayer had — as General Thomas was shown in Cobb, Christy & Co.’s Case to have done, (7 O. Ols. B., 470) — ordered the procurement of the supply “ in the most expeditious manner, at all events,” I am free to admit that his giving such an order would go far toward proving the existence of the emergency described in the statute, and, supported by other proof to the same end, as was done in that case, would justify this court in finding that, in fact, the emergency existed. But if I am capable of comprehending the meaning of language, General Thayer’s order not only did not declare the existence of an emergency, but did not direct the quartermaster to procure the hay “ in the most expeditious manner, without advertisement,” nor even require its “ immediate procurement,” and left it to the quartermaster to decide whether there was “time to advertise and regularly let the contract,” a thing which General Thayer alone had the lawful power to decide, and, being a matter of judgment committed by the law to Mm, he had no lawful right to delegate to a subordinate officer. Here is the order:
“ HEADQUARTERS DISTRICT OE THE FRONTIER,
"Fort Smith, Arle., July 17, 1864.
“ The general commanding directs that you immediately take the necessary steps for the delivery of four thousand tons of hay at Cabin Creek, 40 miles from Fort Gibson, & at Hudson’s Crossing of the Neosho Biver, 70 miles from the fort; two thousand tons to be delivered at each of said points. Should there not be time to advertise & regularly let the contract, you will make the arrangements for the delivery of the hay on the best terms you can, but not to exceed the contract-rates for the delivery of hay at Fort Gibson, O. N., under the existing contract.
“ Very respectfully, &c.,
(Signed) “ T. J. ASDEBSON,
“ Major & A. A. Gen’l.
“ Oapt. Greene Durbin,
“ Chief Quartermaster.”
*544 There is not a word there about procuring- hay “ in the most expeditious manner without ad vertisement,”nor about “its immediate procurement,” but simply a direction to the quartermaster that he “ immediately take the necessary steps for the delivery of 4,000 tons of hay at Cabin Creek and Hudson’s Crossing,” without any direction or intimation of a time of delivery. There is a very wide difference between the two things. The first contemplates immediate action for an immediate result; the second, immediate action for a future result. And beyond doubt, to my mind, the latter was what General Thayer meant; for in the closing sentence of the order he says: “ Should there not be time to advertise and regularly let the contract, yon will make arrangements for the*delivery of the hay ” — not, be it observed, “in the most expeditious manner,” but “on the best terms you can and to show that “best terms” had no reference to time, but only to cost, he adds, “ but not to exceed the contract-rates for the delivery of hay at Fort Gibson, under the existing contract.” And this interpretation of the order is in olear consonance with General Thayer’s approval, the next day, of the contract entered into between the quartermaster and the claimant, for a delivery to begin by August 10, and be completed by September 25.
If, then, General Thayer gave no order either for the procurement of the hay “in the most expeditious manner, without .advertisement,” or for its “ immediate procurement,” there is no semblance of the existence of an emergency requiring its being so procured, much less any proof of it; and if there was no such emergency either declared by General Thayer or fairly inferable from his order, then the quartermaster had no legal authority to enter iuto the contract without advertisement, and it is therefore wholly void.
But if I am wrong in these views, aud if the authority of the quartermaster to make a contract, under the circumstances, for a future supply of hay, without advertisement, ought to be sustained, still the great question of the case, and one I believe not before presented for judicial decision, is to be met and answered.
The claimaut sues to recover the profit he would have made on the hay ho agreed to deliver at Cabin Creek and Hudson’s Crossing, and which he was prevented from delivering by the failure of the military authorities to furnish him sufficient *545 guards and escorts for bis protection while engaged in fulfilling the contract5 and the question is, whether the quartermaster, with or without the approval of General Thayer, had lawful authority to bind the United States, as was attempted to be done by the insertion in the contract of these words: “ It is expressly understood by the contracting parties hereto that sufficient guards and escorts shall be furnished by the Government to protect the contractor while engaged in the fulfillment of this contract.”
To form a just estimate of the extraordinary character of this stipulation, let us glance at the circumstances found by the court to have existed in.the District of the Frontier when this contract was made, and during the time it was to be executed. Along the route of 250 miles from Fort'Gibson to Fort Scott active hostilities existed between the forces of the'United States and those of the rebellion. Armed forces of the rebels were frequently along the road between those places and in the vicinity of hay-stations, with a view of capturing detached parties and attacking supply-trains, and large parties of them appeared frequently in the immediate neighborhood of Fort Gibsou; so that no working parties were allowed to go out from any of the posts within that district without military protection. With the troops of his command, General Thayer had to keep open that whole route of 250 miles and afford that protection, besides meeting such other demands as the state of active hostilities there presented. To do all this, he had one Indian brigade as a permanent force, and they were frequently inside fortifications. Sometimes other troops were temporarily on duty in his district.
Under such circumstances, if the quartermaster had agreed to furnish the claimant such guards and escorts as the necessities and interests of the service might permit, the case would have been very different; but he attempts to bind, not himself alone, nor General Thayer alone, but the Government of the United States, not contingently but absolutely, always and everywhere during the time covered by the contract, to provide sufficient guards and escorts to protect this contractor against all hostile comers, whether a small band of marauding guerillas or a disciplined army requiring a hundred brigades to repel it. At the instant of signing the contract it was as good as broken; for the probabilities were as twenty to one that before its comple *546 tion tbe eon tractor would suffer just what occurred. The stipulation, if binding, made the Government an absolute insurer of the contractor against all the contingencies, casualties, and fists of the enormous war that then shook the land, and against all the damage that might come to him from the enemy.
The mind instantly asks for the law which authorized an assistant quartermaster to bind his Government in such an unprecedented obligation ; and it asks in vain, for there was no such law. If that quartermaster could' have legally made such a contract, of course every other quartermaster in the Army could ’ have done the same. If quartermasters and district commanders could so bargain away the troops for the protection of contractors, then the troops would be notin the service of the Government, but of the contractors. No military officer of any rank, in line or staff, ever had, or ever will have, in this country, such authority. ’ The military forces of the nation cannot, either in peace or war, be so bound to the service of an individual. They are not the subject of such contract, but are absolutely out of the range of all contracts except that which binds each soldier to his duty. Their commander may order them wherever in his district it may, in his judgment, be necessary, but he cannot turn them over by contract to any man.
It was urged that this quartermaster did no more in this matter than other quartermasters did, all through the war, in chartering vessels and agreeing that the Government should bear certain risks while the charter lasted, and that contracts of that kind have been judicially upheld. But the cases are not alike, for in no instance that has yet appeared was there a stipulation binding tbe Government to furnish sufficient guards and escorts to protect the chartered vessel against the enemy while she was in the service of the United States. The nearest-to it that has come under my notice was the chartering of a vessel, and stipulating that the Government should bear all risks; and yet, when properly regarded, there is no real likeness between that case and this.
When the Government, in time [of war, needs vessels for its transport-service, there are three was of-getting them — by purchase, by impressment, or by hiring.
If it purchases, it of course assumes all risks while its ownership lasts.
If it impresses, it assumes all risks while the impressment lasts.
*547 If it hires the entire vessel, with the possession, command, and control of navigation wholly vested in and held and exercised by the Government, then the Government is, in law, considered the owner for the voyage or service stipulated. (Leary v. The United States, 14 Wall., 607.) In such case the Government assumes all risks unless the owner consent to bear part of them. When, therefore, in the ease of such hiring as that, a quartermaster stipulates either that the Governrajnd shall bear the war risk, or that it shall bear all risks, he thereby imposes no liability upon the Government, for he only expresses on paper an obligation which the law itself imposes, through the mere fact of a hiring which divests the owner of all possession and control, and transfers all possession and control to the Government.
If it hires a vessel which, though officered, manned, and managed by her owner, is placed under the orders of the Government, is to go wherever ordered, and nowhere without orders, and it is stipulated that the Government shall bear the Avar risk, or even all risks, the utmost limit of resulting liability upon the Government would be the value of the vessel, if she should be lost by such risk while obeying orders; and it may well be questioned whether the Government would not, without such stipulation, be bound, in case of such loss, to pay that value. But whether so or not, that case is unlike this; because here the contract bound the Government to follow a man, not under its orders, with sufficient guards and escorts to protect him while engaged in fulfilling the contract, whenever and wherever he might, ex mero motu, see fit to go to procure the hay he was to deliver; and if, in spite of all the efforts the military authorities could make to protect him, he should be prevented by au'over-powering force of the enemy from fulfilling the contract, then that the Government should be bound, to an undefined and unlimited extent, to pay him all damages he should hereby suffer. In one case the agreement was to bear the loss of a thing which the Government had always, so to speak, in its own hands; in the other, to bear the damage which a contractor might suffer, whose movements Avere always to be his own, and not at any time to be made under the Government’s orders, or subject to its control. The two cases seem to me to be essentially different.
My opinion, then, is that when this quartermaster assumed *548 to bind the Government to do what the mere fact of making' a contract for the delivery of the hay did not in law entitle the claimant to have done for him, that is, to furnish him with unlimited and always effective guards and escorts, wherever and whenever during the stipulated time he might be engaged in fulfilling the contract, regardless of all other demands and exigencies of surrounding war, he undertook to do what he had no authority for doing, whether with or without the orders or the approval of the commander of the district; and his stipulation to that end was wholly void, even if the remainder of the •contract be held valid.
But it is suggested that as the hay was cut from the public domain it belonged to the Government, and, therefore, when thequartermaster agreed to furnish, sufficient guards and escorts, it was in reality for the protection of the property of the United States. Unfortunately, however, for this view, the land was only in a limited sense a part of the public domain. , The title to the soil was in the United States, but the Government had long ago, by treaties which are still in force, ceded and guaranteed the possession, use, and occupation thereof to the Cherokee Nation of Indians. Therefore the produce of the soil did not belong to the Government, but to that nation. Still further, unfortunately, if the hay belonged to the United States, then there was no legal right in the claimant to be paid at the Treasury for what was destroyed by the rebels, nor is there any right in him now to recover here for what he was prevented, by the want of sufficient guards and escorts, from delivering under the contract.
But there.is another and very grave question remaining to be considered. The claimant succeeded in obtaining the allowance by the accounting-officers of the Treasury, and the pay ment out of the Treasury of $3,340 for hay which he had caused to be cut under his contract, and which, before its delivery to the military authorities, was destroyed by rebel enemies at Cabin Creek and Hudson’s Crossing; and also $16.774, as compensation for property destroyed there by the same enemies; both of which losses those accounting-officers found to have been “occasioned by the failure of the Uuited States to furnish sufficient guards, as stipulated in the contract.” The Government seeks to recover back those sums by way of counter-claim in this suit. This brings up the question of the legality of those allowances.
*549 If the agreement for sufficient guards and escorts be held invalid, the allowances were clearly unlawful. But assuming it to have been valid and binding upon the United States, were those allowances such as the accounting-officers had lawful authdl’ity to make! I think not, for the following reasons:
1. The allowances were adjudications of unliquidated damages in favor of the claimant; and, in my opinion, they had no jurisdiction to make any such adjudication. This court is the tribunal to which the Government has consented to refer such matters. But as Judge Bichardson’s opinion, next to be read, covers this point, and I concur in if, I will not enlarge in this direction.
2. Supposing those officers to have had the authority to allow unliquidated damages against the Government, they had not, in my judgment, the least power to base the allowance upon the destruction by rebel enemies of the claimant’s property; and the fact that it was destroyed “ while being used in preparing hay under this contract ” did not at all confer that power. The case, to my view, is one of the absolute absence of authority in any officer of the Government, upon any ground, to pay any man, contractor or other, any compensation whatever for his property destroyed in war by the enemy, except in cases where such payment is authorized by express statute of the United States. No nation ever acknowledged itself bound, on principles of public law, to pay its citizens for their property destroyed by the public enemy in time of war. Every such principle, as well as every consideration of public policy, forbids such obligation. But any nation may, out of commiseration for individual losses, disregard those principles and considerations, and provide, by express law, for such cases.
The United States did this in the second section of the Act March 3, 1849, (9 Stat. L., 414,) in these words: “ That any person who has sustained, or shall sustain, damage by the capture or destruction by an enemy * * * of any horse, mule, ox, wagon, cart, boat, sleigh, or harness, while such property was in the military service of the United States, either by im-pressment or contract, except in cases where the risk to which the property would be exposed was agreed to be incurred by the owner, * * * shall be allowed and paid the value thereof at the time lie entered the service: Provided, It shall appear that such * * * capture [or] destruction * * * *550 was without any fault or negligence on the part of the owner of the property, and while it was actually employed in the services of the United States.”
The Supreme Court held, in Stuart v. The United States, (18 Wall., 84,) that this statute was intended for the indemnity of those engaged in the actual military service of the United States; that is, for enlisted men while in performance of their duties as such; and, therefore, that a contractor for land transportation of military stores and supplies was not in the military service, and could claim no benefit under that statute. And in Shaw's Case, in this court, (9 C. Cls. R., 388,) affirmed, on appeal, by the Supreme Court, (93 U. S. R., 235,) where a steamer was taken into the service of the United States by a quartermaster, upon a notice to her captain that the Government would require her service for a trip to Memphis, Yicksburgh, and other points, accompanied by a statement of the per-diem compensation which would be allowed for its use, and for the subsistence of the men in addition to their wages, and fuel for the vessel, to which notice and service no objection was made by the captain, and while engaged in the service the possession, command, and management of the steamer were retained by her owner, it was held that the steamer was not in the military service of the United States within the meaning of the Act March 3, 1849, (amended by the Act March 3, 18C3, (12 Stat. L., 743, § 5,) extending its provisions to steamboats,) so as to make the Government liable for her loss by fire.
Underthe.se decisions there is no ground for contending that this claimant was in the military service while engaged in fulfilling the contract of July’ 18. Not having, then, been in that service, he had no claim upon the Government for compensation for the destruction of hay and other property by rebel enemies; and, therefore, the accounting-officers had no jurisdiction whatever to allow him the sums which, upon their allowance, were paid him out of the Treasury for such destruction. Because they had no such jurisdiction the payments so made to him, and his receipt of them, were both unlawful, and the United States are entitled to recover back the amount thereof by way of counter-claim in this action. '
1 am authorized to state that Rigiiakdson, J., concurs in this opinion.